THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MATTHEW E. WESTCOTT,<br><br>                Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE,<br>COMMISSIONER OF SOCIAL SECURITY,<br><br>                Defendant. | )<br>)<br>)<br>)<br>)<br>)   Civil Action No. 10-cv-78<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

<u>MEMORANDUM OPINION</u>

CONTI, District Judge

### *Introduction*

Pending before the court is an appeal from the final decision of the Commissioner of

Social Security ("Commissioner" or "defendant") denying the claim of Matthew Westcott

("plaintiff" or "Westcott") for disability benefits ("DIB") under Title II of the Social Security Act

("SSA"), 42 U.S.C. §§ 401-34, and supplemental security income ("SSI") benefits under Title

XVI of SSA, 42 U.S.C. §§ 1381-83f. Westcott contends that the decision of the administrative

law judge (the "ALJ") that he is not disabled, and therefore not entitled to benefits, should be

reversed or at least remanded for reconsideration because his impairments preclude him from

being able to work on a full-time regular basis. The Commissioner asserts that the ALJ's

decision is supported by substantial evidence. The parties filed cross-motions for summary

judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. Because the decision

of the ALJ is supported by substantial evidence, the court will grant defendant's motion for

summary judgment and deny plaintiff's motion for summary judgment.

## *Procedural History*

Westcott proactively filed the DIB application at issue in this appeal on October 9, 2007, asserting a disability since June 15, 2002 due to major depressive disorder,[1] generalized anxiety disorder[2] and acute rhabdomyolysis.[3]  (R. at 122, 146).  Plaintiff filed an application for SSI benefits on November 2, 2007.  (R. at 124-26).  On May 21, 2008, plaintiff's claims were initially denied.  (R. at 81-90).  A timely written request for a hearing before the ALJ was filed by plaintiff, and the hearing was held on December 3, 2008.  (R. at 67-80).  At the hearing, plaintiff appeared with counsel and testified before the ALJ.  (R. at 8-54).  A vocational expert (the "VE") also testified.  (R. at 43-54).

In a decision dated May 7, 2009, the ALJ determined that plaintiff was not under a disability within the meaning of the SSA.  (R. at 67-80).  The ALJ determined that when considering all plaintiff's impairments, including his substance abuse disorder and the limitations

---

[1]"Period (episodes) that include greater than or equal to five mental or physical symptoms and last greater than or equal to two weeks are classified as major depression.  Symptoms must include sadness deep enough to be described as despondency or despair (often called depressive mood) or loss of interest or pleasure in usual activities (angedonia).  Other mental symptoms include feelings of worthlessness or guilt, recurrent thoughts of death or suicide, reduced ability to concentrate, and occasionally agitation.  Physical symptoms include changes in weight or appetite, loss of energy, fatigue, psychomotor retardation or agitation, and sleep disorders (insomnia, hypersomnia, early morning awakening)." *Merck Manual,* 1705 (18th ed. 2006).

[2] Generalized anxiety disorder is "characterized by excessive, almost daily, anxiety and worry for greater than or equal to six months about many activities or events.  The cause is unknown, although it commonly coexists in people who have alcohol abuse, major depression, or panic disorder.  Diagnosis is based on history and physical examination.  Treatment is psychotherapy, drug therapy, or both." *Id.* at 1673.

[3] Rhabdomyolysis is the destruction or degeneration of skeletal muscle tissue (as from traumatic injury, excessive exertion, or stroke) that is accompanied by the release of muscle cell contents (as myoglobin and potassium) into the bloodstream resulting in hypovolemia, hyperkalemia, and sometimes acute renal failure.  *Id.* at 1055, 1268, 1526 .

they create, there were no jobs available in the national economy plaintiff could perform. (R. at 74). The ALJ determined that absent plaintiff's substance abuse, considering plaintiff's residual functional capacity ("RFC"), age, education, and work experience, there would be a significant number of jobs that plaintiff could perform. (R. at 75-79). Therefore, the ALJ found plaintiff's substance abuse disorder to be a contributing factor material to the determination of his disability. (R. at 79). Since a substance abuse disorder was a contributing factor material to the determination of disability, the ALJ concluded that plaintiff was not "disabled" under the SSA for either DIB or SSI. (R. at 68, 79). Plaintiff filed a request to review the ALJ's decision, which was denied by the Appeals Council on November 21, 2009. (R. at 1-4). On January 19, 2010, plaintiff timely filed this present action seeking judicial review. (ECF No. 1).

### *Plaintiff's Background, Medical Evidence and Testimony*

#### *Background*

At the time of the hearing before the ALJ, Westcott was forty-nine years old. (R. at 17). Plaintiff completed high school and obtained an accounting degree from Slippery Rock University. (R. at 17). Plaintiff was single and lived by himself in a duplex he owned. (R. at 28). Plaintiff was financially supported by his mother and rental money from the other half of his duplex. (R. at 35). He sold aluminum cans as scrap for spending money. (R. at 35). Plaintiff reported he last worked in 2005 or 2006 as a truck driver when he was laid off[4]. (R. at 35, 44-45). Prior to his alleged onset date, plaintiff had worked as an accountant for approximately ten

---

[4] The date plaintiff last worked could not be easily determined. Although plaintiff testified he last worked as a truck driver in 2005-06, the last reported income to the Social Security Administration was in 2002. (R. at 45). In his decision, the ALJ noted that he afforded plaintiff the benefit of the doubt and found plaintiff had not engaged in substantial gainful employment since his alleged onset date in 2002. (R. at 70).

years and as a prep-cook.  (R. at 17, 44, 147, 164, 404).

### *Medical History*

Plaintiff has a long history of drinking alcohol to excess and using marijuana.  (R. at 201-21, 571, 577, 582-83, 589).  He has a history of mental health issues, primarily depression.  (R. at 410, 413, 414).  Although plaintiff's alleged disability onset date is June 15, 2002, there are no medical records of treatment until May 2004, when plaintiff was seen by Dr. Paul Sung, M.D., his primary care physician ("PCP").  (R. at 438).  In June 2004, Dr. Sung diagnosed plaintiff with anemia[5] and alcohol abuse.  (R. at 439).  There are no further treatment records until plaintiff's hospitalization on September 23, 2007.  (R. at 182-91).

### *Plaintiff's Hospitalization for Fall*

On September 23, 2007, plaintiff's mother, Mary Lou Westcott, found plaintiff passed out in his apartment.  (R. at 182-91).  Ms. Westcott notified the police and plaintiff was taken to Jameson Memorial Hospital.  (R. at 182, 583).  Excessive alcohol use was suspected to have contributed to his fall, which resulted in a closed-head injury.  (R. at 182, 186-87, 203-04, 300).  During hospitalization, plaintiff was found to be confused and he was unable to provide appropriate answers to questions regarding his family or personal health history.  (R. at 186, 195, 196, 201, 203).  MRI and CT scans of plaintiff's brain documented some abnormalities.  (R. at 186, 188).  Plaintiff was treated for acute rhabdomyolysis.  (R. at 182-85, 189-90, 203-05).

---

[5]Anemia is "a decrease in the number of red blood cells, hematocrit, or hemoglobin content." *Merck Manual*, 1031 (18th ed. 2006).

On October 1, 2007, plaintiff was transferred to a rehabilitation program for treatment of his traumatic brain injury. (R. at 205, 300, 302-03). At his initial consultation, it was noted that plaintiff had deficits in many cognitive areas including "speech and language, spacial relationships, insight problem solving, registration and memory." (R. at 300). During eleven days of rehabilitation, plaintiff received occupational and physical therapy for alcoholic-related encephalopathy and probable Marchiafava-Bignami disease[6]. (R. at 304-05, 333-61, 370-85). On October 12, 2007, at plaintiff's discharge, his cognitive status was significantly improved from his initial consultation. (R. at 300). Plaintiff refused any drug and alcohol assessment intervention and was discharged as "medically stable." (R. at 300-01).

### Plaintiff's Suicide Attempt

On February 14, 2008, plaintiff attempted to shoot himself in the head and commit suicide. (R. at 387-88, 449, 451). The bullet missed plaintiff's head, grazing his forehead and the right side of his scalp. (R. at 387). Following the attempt, plaintiff was again admitted to Jameson Memorial Hospital's emergency room. (*Id.*). Plaintiff's blood alcohol content upon admission was 218.3. (R. at 391, 464). He admitted to being intoxicated and drinking three or four beers a night, three or four days a week. (R. at 391-92). Plaintiff stated that on the day of his suicide attempt, he had also had a few "other alcoholic beverages." (*Id.*).

---

[6] Marchiafava Bignami disease is a "progressive degeneration of the corpus callosum characterized by progressive intellectual deterioration, emotional disturbances, confusion, hallucinations, tremor, rigidity, and convulsions. It is a very rare disorder affecting chiefly middle-aged male alcoholics; also seen in patients with nutritional deficiency states." *Dorland's Illustrated Medical Dictionary,* 1097 (30th ed. 2003).

Two days later, on February 16, 2008, plaintiff was moved to the hospital's psychiatric ward. (R. at 388). Plaintiff claimed he was extremely depressed and wanted to kill himself. (R. at 388, 391). Plaintiff was prescribed Prozac for his depression and Trazodone[7]. (R. at 410, 459, 466). While hospitalized, plaintiff complied with treatment and no longer exhibited suicidal tendencies. (R. at 465-66). Plaintiff was discharged from the hospital on February 21, 2008. (R. at 466). When discharged, plaintiff was referred to a six-week partial hospitalization program. (R. at 459-60).

### Dr. Kirk M. Lunnen

On March 17, 2008, Kirk M. Lunnen, Ph.D., performed a consultative psychological evaluation of plaintiff. (R. at 403-09). Dr. Lunnen noted that plaintiff displayed poor hygiene and grooming and appeared moderately dysthymic[8] and somewhat anxious/nervous. (R. at 404-05). Plaintiff reported he felt hopeless and helpless in life, but that he was happy his suicide attempt was a failure. (R. at 403). Plaintiff's overall behavior and psychomotor activity were normal. (*Id.*). His thought processes were logical linear, and goal directed. (R. at 405).

Plaintiff claimed his concentration was poor, but Dr. Lunnen's testing revealed average concentration. (*Id.*). Dr. Lunnen noted that in terms of concentration, persistence, or pace, "testing during the present evaluation did not indicate any present problems in these areas." (R.

---

[7] Prozac and Trazodone are both medicines known as antidepressants or "mood elevators" used to relieve mental depression and depression which sometimes occurs with anxiety. U.S. National Library of Medicine, National Institutes of Health, http://www.nlm.nih.gov (last visited 7/28/10).

[8] Dysthymic is the adjective related to dysthymia which is defined as "low-level or subthreshold depressive symptoms. Symptoms typically begin insidiously during adolescence and follow a low-grade course over many years or decades; dysthymia may intermittently be complicated by episodes of major depression. Affected patients are habitually gloomy, pessimistic, humorless, passive, lethargic, hypercritical of self and others, and complaining." *Merck Manual,* 1705 (18th ed. 2006).

at 406). Plaintiff's social judgment and insight were intact. (*Id.*). Dr. Lunnen noted that plaintiff had slight limitations in his ability to perform work-related mental activities and "moderate" limitations in understanding, remembering, and carrying out detailed instructions. (R. at 408-09). Overall, plaintiff "presented with fairly intact cognitive functioning." (R. at 406).

Dr. Lunnen diagnosed plaintiff with depressive and anxiety disorders, as well as alcohol dependence. (R. at 405-06). Dr. Lunnen noted that the "majority of the claimant's difficulties appear to be a function of his substantial history of substances abuse." (R. at 406). He concluded that assuming a period of sobriety, plaintiff could experience some improvement over time. (*Id.*).

### Dr. R. Liedke

On March 18, 2008, plaintiff was seen by one of the Bureau of Disability Determination's consultative examiners, R. Liedke, M.D. (R. at 410-18). At the time of Dr. Liedke's examination, plaintiff had been receiving drug and alcohol rehabilitation for three weeks and reported being clean for eight weeks. (R. at 410-11).

Plaintiff was continuing to take Prozac and Trazodone. (R. at 410). Plaintiff's chief complaint was depression. (R. at 410). Plaintiff reported poor sleep habits and a slight change in his memory. (R. at 411). He spent most of his time watching television or playing games on the internet. (R. at 412). Dr. Liedke noted that plaintiff had little social interaction outside internet contacts. (*Id.*). Physically, plaintiff appeared disheveled and had at best fair hygiene. (*Id.*).

Dr. Liedke noted that plaintiff was quiet and reserved, but appeared to be "a very bright man." (R. at 413). Plaintiff's speech was "very direct and surprisingly articulate." (*Id.*). Plaintiff was observed to have answered all questions completely and did not appear anxious or panicky.

(R. at 413). Dr. Liedke concluded that plaintiff's "overall personality type appeared to be quiet and reserved and this apparently has been his situation all his life." (*Id.*). He also noted that in the past plaintiff had used alcohol to self-medicate. R. at 414). Plaintiff reported to Dr. Liedke that he never had a problem with illegal drugs. (R. at 412).

Plaintiff reported to Dr. Liedke that his "ultimate goal is to get himself feeling better and get the depression under control and then get back into some sort of gainful employment." (R. at 414). Dr. Liedke diagnosed plaintiff with depression and alcohol abuse, currently in remission. (R. at 413). Dr. Liedke noted that plaintiff could lift and carry up to fifty pounds occasionally and twenty-five pounds frequently, but otherwise had no physical limitations. (R. at 415-16). Dr. Liedke concluded that "[i]t would be interesting to see once these depression symptoms are under control how he would test from an occupational/vocational rehabilitation standpoint." (R. at 414).

### *Follow-Up Treatment at Human Services Center ("HSC") with Dr. Mark Matta*

Upon discharge from the partial hospitalization program, plaintiff went to the HSC for follow-up treatment. (R. at 563-81). Plaintiff was first seen by Mark Matta, D.O., a psychiatrist, on February 17, 2008 and February 26, 2008. (R. at 459, 477). Dr. Matta noted plaintiff had no psychotic manifestations or clinical evidence of brain damage. (R. at 459). Plaintiff "admitted to drinking, but he has never been intoxicated . . . ." (R. at 459). Plaintiff's speech was "soft and spontaneous." (R. at 477). His thoughts were linear and goal directed and negative for suicidal intention. (R. at 478). Dr. Matta diagnosed plaintiff with major depression, schizoid personality disorder, and psychosocial stressors, moderate. (R. at 459).

On March 6, 2008, plaintiff reported to Dr. Matta "overall good medication efficacy and

8

compliance." (R. at 461). Plaintiff expressed no suicidal thoughts and reported that he would like to continue the medicine protocol. (*Id.*). On May 20, 2008, plaintiff was evaluated by Dr. Matta. At the evaluation, plaintiff stated that he had not used alcohol in the past month. (R. at 571). Plaintiff stated his previous alcohol use was five to six shots of whiskey at a time, three to four days a week. (R. at 571). Dr. Matta diagnosed him with major depressive disorder, generalized anxiety disorder, and panic disorder without agoraphobia. (R. at 564). Plaintiff's Global Assessment of Functioning ("GAF") score was 45.[9] (R. at 564). Dr. Matta noted alcohol abuse disorder as an alternative to be ruled out. (*Id.*). Again, no physical limitations were noted. (R. at 574). Plaintiff was referred to Alcoholics Anonymous ("AA") for support and guidance. (R. at 574).

Dr. Matta evaluated plaintiff again on July 15, 2008. (R. at 576-78). Plaintiff complained of increased anxiety and panic. (R. at 576). Plaintiff was alert and oriented. (R. at 577). Although plaintiff was depressed and anxious, he did not present suicidal thoughts. (*Id.*). Plaintiff's thought processes were logical; his impulse control was fair; and his insight and judgment were good. (*Id.*). Dr. Matta increased plaintiff's Trazodone dosage. (R. at 578). Plaintiff received a prescription for Paxil[10] and Vistaril[11] and his prescription for Prozac was

---

[9] The Global Assessment of Functioning ("GAF") scale, designed by the American Psychiatric Association, ranges from zero to one hundred and assesses a person's psychological, social and occupational function. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR), 34 (4th ed. 2000). A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting ) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

[10] Paxil is "used to treat depression, panic disorder (sudden, unexpected attacks of extreme fear and worry about these attacks), and social anxiety disorder (extreme fear of interacting with others or performing in front of others that interferes with normal life)." U.S. National Library of Medicine, National Institutes of Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001037 (last visited 12/9/2010). Adverse side effects include: "difficulty concentrating," "seeing things or hearing voices that do not exist (hallucinating) ," "fever, sweating, confusion, fast or irregular heartbeat, and severe muscle stiffness," and "unsteady walking that may cause falling. . . ."

discontinued.  (*Id.*).  Plaintiff followed up with Dr. Matta again in August and September 2008.  (R. at 579-80).  Plaintiff was compliant with medications and reported that he was feeling "much better."  (*Id.*).  He was less depressed and had clearer thoughts.  (R. at 579).  Plaintiff reported he was able to leave the house more often to walk and go to flea markets.  (*Id.*).  He continued to spend time watching videos.  (R. at 580).

In October 2008, plaintiff returned to the HSC and reported he was experiencing daily panic attacks, but that Vistaril was "helping with this."  (R. at 581).  Plaintiff was still negative for suicidal thoughts, intent, or plan.  (*Id.*).  Plaintiff reported good sleep and appetite.  (*Id.*).  Dr. Matta described plaintiff's mood as good, other than his "occasional" panic symptoms.  (*Id.*).  Dr. Matta increased plaintiff's Paxil dosage to help with panic symptoms and renewed his prescriptions for Trazodone and Vistaril.  (*Id.*).

On December 22, 2008, plaintiff underwent an additional psychiatric evaluation by Dr. Matta.  (R. at 582-86).  Dr. Matta reviewed plaintiff's mental health history, as well as his alcohol use.  (*Id.*).  Plaintiff's mood was noted to have improved and plaintiff reported he was doing well.  (R. at 583).  He complained of forgetfulness and difficulty with concentration.  (*Id.*).  Plaintiff stated he continued to drink on occasion on the weekends.  (R. at 584).  He admitted to smoking marijuana whenever he could get it and reported he had been arrested the prior month for possession of drug paraphernalia.  (*Id.*).  Plaintiff reported he was stopped for a traffic violation

_____

*Id.*

[11] Vistaril is an antihistamic used to treat allergic reactions. U.S. National Library of Medicine, National Institutes of Health,  http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000796 (last visited 12/9/2010).  Adverse side effects include: "dry mouth, nose, and throat,  upset stomach, drowsiness, dizziness, chest congestion, headache, reddening of skin . . . difficulty breathing, muscle weakness, increased anxiety."  *Id.*

and the arresting officer found marijuana in a medicine bottle. (R. at 583, 584).

Dr. Matta noted that plaintiff was disheveled. (R. at 585). His mood was calm and euthymic and his thought processes were linear and goal directed. (*Id.*). Plaintiff's speech was somewhat hesitant and his insight and judgment were poor. (*Id.*). There was no evidence of psychosis, delusions or paranoia. (*Id.*). Plaintiff's thought content was also negative for suicidal ideation. (*Id.*).

Dr. Matta diagnosed plaintiff with substance-induced depression, alcohol dependence in partial remission, marijuana abuse, and nicotine dependence. (R. at 585). He concluded that there was a high likelihood of a connection between plaintiff's complaints of forgetfulness and poor concentration and his substance abuse history. (*Id.*). Plaintiff reported he had recently sought employment and seemed willing to work, but was skeptical about his ability to keep a job. (R. at 585-86). Dr. Matta recommended neuropsychological testing to better assess plaintiff's cognitive ability. (R. at 586).

### Dr. Julie Uran's Psychological Disability Evaluation

Dr. Julie Uran, Ph.D., performed a neuropsychological evaluation of plaintiff on January 6, 2009 and January 22, 2009. (R. at 588-93). Plaintiff reported that he had not used alcohol for three months and had not used marijuana for one month. (R. at 589). Dr. Uran noted that plaintiff had been arrested for driving under the influence ("DUI") three months prior to the appointment and that his driver's license was in the process of being revoked. (R. at 589). Plaintiff reported the he had a history of depression and anxiety, but when questioned about his present state, he reported he was feeling better. (*Id.*).

Dr. Uran administered a variety of neuropsychological tests to plaintiff. Dr. Uran noted that while she was out of the examination room, plaintiff read through the test booklet and questioned why he was not being administered certain tests. (R. at 590). Dr. Uran noted that plaintiff had inefficient brain processes "particularly for higher level mental faculties." (R. at 591). Plaintiff had deficits with tactile sensitivity, psychomotor speed, immediate and delayed visual recall, and auditory discrimination. (R. at 590-91). Dr. Uran concluded that plaintiff would have difficulty performing tasks involving speed of execution, sustaining attention and concentration, carrying out instructions and interacting with others. (R. at 591). Dr. Uran could not ascertain the cause of plaintiff's deficits, but noted that his alcohol usage should be considered. (*Id.*).

### *Dr. John Rohar-Mental Residual Functional Capacity Assessment*

On May 20, 2008, John Rohar, Ph.D., a reviewing psychologist, completed a mental residual functional capacity assessment of plaintiff. (R. at 419-22). Plaintiff was assessed a medically determinable impairment of Alcohol Dependence, Depressive Disorder NOS and Anxiety Disorder NOS. (R. at 421). Dr. Rohar assessed that plaintiff's "basic memory processes are intact." (*Id.*). Further, "[h]e is able to carry out very short and simple instructions. He can function in production oriented jobs requiring independent decision making. There are no restrictions in his abilities in regards to social interaction and adaptation." (*Id.*).

### *Testimony from Hearing*

### *Plaintiff's Testimony*

At the hearing, plaintiff testified that he had severe depression and anxiety before his attempted suicide in February 2008, but had not received treatment because he did not know

12

"what was happening. . . until it actually happened." (R. at 18). Plaintiff testified that since his suicide attempt and subsequent hospitalization, he had been following up at the HSC and the medications he was prescribed were very helpful. (R. at 19). Despite the medications, plaintiff testified he was still unable to sleep many nights for the last "two or three years," (R. at 19), and has a very poor appetite. (R. at 19-20).

Plaintiff used marijuana "on and off since high school" and almost drank himself to death on whiskey. (R. at 20-21). In terms of his alcohol abuse, plaintiff testified that since his discharge from the hospital in February 2008, he would drink one can of beer on Friday or Saturday nights and last drank beer two to three weeks prior to the hearing. (R. at 21).

Plaintiff testified that he no longer used the computer or drove a car because he "felt uncomfortable." (R. at 26). Although he had been an accountant, plaintiff was no longer able to do even simple math without writing it down. (R. at 30). When questioned by the ALJ, plaintiff stated that he believed he could not work because he has a lack of concentration, sleep and energy. (R. at 23, 32). When questioned by his attorney, plaintiff elaborated that he was able to concentrate for thirty minutes at a time, on and off throughout the day. (R. at 52).

### Plaintiff's Mother's Testimony

Plaintiff's mother, Mary Lou Westcott, also testified at the hearing. (R. at 37). Ms. Westcott testified that she was concerned because she believed Westcott had been drinking since his February 2008 hospitalization. (R. at 38). She saw an improvement in the way her son speaks to her. (R. at 41). Her son had difficulty with concentration and often forgets what day it is. (R. at 41-42).

### *VE's Testimony*

The VE testified that plaintiff had worked as an accountant for three years from 1992 until 1995, which is classified as sedentary-skilled work. (R. at 44). Plaintiff also worked as a driver and prep cook, which are both medium semi-skilled work. (R. at 44). The VE was questioned about a hypothetical person with Westcott's education, training and work experience who would be able to work at the light exertional level, avoiding exposure to dangerous machinery, unprotected heights and limited to simple, routine, repetitive work, not performed in a fast-paced production environment involving only simple, work-related decisions, relatively few workplace changes, relatively low stress and limited to occasional interaction with supervisors, coworkers and the general public. (R. at 45-46). The VE testified that this person would not be able to perform plaintiff's past work positions. (R. at 46).

The VE stated that a hypothetical person with that background and limitations would be able to perform the positions of cleaner, packer and housekeeper, which are defined as light unskilled work. (R. at 46). The VE provided laundry workers as another example of a position the hypothetical person would be able to perform. (*Id.*). When asked by plaintiff's counsel if the same hypothetical person also had difficulty concentrating for thirty minutes every sixty minutes, the VE testified that there would be no jobs this person could perform in the national economy. (R. at 51).

### *Record Held Open*

At the beginning of the hearing on December 3, 2008, plaintiff's counsel advised the ALJ that plaintiff would have one or two supplemental reports and that the reports would "be in the nature of some sort of opinion . . . on the level of impairment and the role or drug and alcohol use

in that." (R. at 12-13). The AJ agreed to keep the record open to receive those records. (R. at 14). The supplemental reports of Dr. Matta and Dr. Uran do not contain opinions about the role of drugs and alcohol in the impairments. (R. at 582-96). Dr. Matta noted:

> It is difficult to assess how significant his substance abuse history has contributed to his current episodes of forgetfulness and concentration. However, it cannot be ruled out.

(R. at 585).

### Legal Standard

This court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). Congress has expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . . " 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

## Discussion

Under Title XVI of the SSA, a disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c (a)(3)(A). A person is unable to engage in substantial gainful activity when "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c (a)(3)(B).

In order to make a disability determination under the SSA, a five-step sequential evaluation must be applied. 20 C.F.R. §§ 404.1520, 416.920. The evaluation consists of the following phases: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the claimant's severe impairment meets or equals the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) if not, whether the claimant's impairment prevents her from performing her past relevant work; and (5) if so, whether the claimant can perform any other work which exists in the national economy in light of her age, education, work experience, and residual functional capacity. 20 C.F.R. §§ 404.1520, 416.920; *Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000). If the plaintiff fails to meet the burden of proving the requirements in the first four steps, the administrative law judge may find that the plaintiff is not disabled. *Burns v. Barnhart*, 312 F.3d 113, 119 (3d Cir. 2002). The Commissioner is charged with the burden of proof with respect to the fifth step in the evaluation process. *Id.*

In the instant case, the ALJ found with respect to the sequential evaluation that: (1) plaintiff had not engaged in substantial gainful activity since June 15, 2002; (2) plaintiff suffers from rhabdomyolysis, alcohol-related encephalopathy with probable Marchiafava Bignami, substance-induced depression, generalized anxiety disorder, marijuana abuse, and alcohol dependency, which are severe impairments; (3) plaintiff's impairments do not meet or medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) plaintiff is unable to perform any past relevant work and (5) considering plaintiff's age, education, work experience, and residual functional capacity including substance abuse disorders, there are no jobs that exist in significant numbers in the national economy that plaintiff can perform. (R. at 70-74).

The ALJ examined plaintiff's impairments considering the effect of his not having a substance abuse disorder. The ALJ found that if plaintiff stopped his substance abuse, he would continue to have a severe impairment or combination of impairments. (R. at 75). None of these impairments or combination of impairments would meet or medically equal any of the impairments listed in 20 C.F.R. pt. 404, subpt. P, app. 1. (*Id.*). The ALJ found that without considering plaintiff's substance abuse, he would have the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), except he

> could not perform more than occasional postural maneuvers; would be required to avoid any exposure to dangerous machinery and unprotected heights; would be limited to simple, routine, repetitive work not performed in a fast paced production environment, involving only simple work-related decisions with relatively few work-place changes and relatively low stress; and would be limited to the occasional interaction with supervisors, co-workers, and the general public.

(R. at 76).

Based on the RFC, the ALJ found that if plaintiff stopped his substance abuse, he would

continue to be unable to perform past relevant work.  (R. at 79). There, however, would be a significant number of jobs in the national economy that plaintiff would be able to perform.  (R. at 79).

The ALJ determined that since plaintiff would not be disabled if he stopped his substance use, his substance abuse disorder is a contributing factor material to the determination of disability.  (*Id.*).  Based on the Contract with America Advancement Act, Pub. L. No. 104-21, 110 Stat. 847 (1996), the ALJ concluded that plaintiff was not disabled within the meaning of the Act at any time from the alleged onset date through the date of the decision.  (R. at 79-80).

Plaintiff raises one main issue:  whether the ALJ erred in determining that based upon plaintiff's impairments, absent his substance abuse, there were a significant number of jobs in the national economy plaintiff could perform.  (ECF. No. 7 ("Pl.'s br."), 7).

Plaintiff argues that "the ALJ committed reversible error in determining that Mr. Westcott's impairments, absence [sic] his substance abuse, were not severe."  (Pl.'s br. 7).  Plaintiff appears to argue that the ALJ's error was finding that absent his substance use, the remaining impairments "were not severe enough to find that he is disabled."  He, however, is not accurately characterizing the ALJ's decision.  (Pl.'s br. 7).  The ALJ found that if plaintiff's substance use was not considered, plaintiff would continue to have a severe impairment or combination of impairments.  (R. at 75).  The ALJ noted that combination of impairments -- "rhabdomyolysis, depression, anxiety, and remaining cognitive deficits" -- would "significantly impact his ability to perform basic work activities and are therefore severe within the meaning of the regulations."  (R. at 75).

In the alternative, plaintiff argues that the ALJ's decision is not supported by substantial

evidence because absent his substance use disorder, his remaining functional limitations would still render him incapable of performing positions with a significant number of jobs in the national economy. Plaintiff notes that his medical records, especially in periods of sobriety, "show that his mental and physical impairments continue to be severe and would preclude him from performing any type of substantial work." (Pl.'s br. 7, 9).

The district court's function is to determine whether the record, as a whole, contains substantial evidence to support the Commissioner's findings. *See Adorno*, 40 F.3d at 46 (citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). The United States Court of Appeals for the Third Circuit has referred to this standard as "less than a preponderance of the evidence but more than a mere scintilla." *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir.2002), quoting *Jesurum v. Sec'y of the Dep't of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir.1995). "A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir.1993), quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983).

In reviewing the record for substantial evidence, the district court does not weigh the evidence or substitute its own conclusions for those of the fact-finder. *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2004). The district court considers and reviews only those findings upon which the administrative law judge based his or her decision, and cannot rectify errors, omissions or gaps in the medical record by supplying additional findings from its own independent analysis of portions of the record which were not mentioned or discussed by the administrative law judge. *Fargnoli v. Massarini*, 247 F.3d 34, 44 n. 7 (3d Cir.2001).

The question in this case is whether the ALJ's decision that plaintiff would not be disabled without substance abuse was supported by substantial evidence. The ALJ's analysis in determining plaintiff's disability without substance use disorders centered on plaintiff's RFC. The ALJ concluded that if plaintiff stopped his substance use, he would have the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b) with several limitations. (R. at 76). In making this finding, the ALJ stated he considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. (*Id.*). The ALJ explained his conclusion based on the record.

The ALJ found plaintiff's testimony "concerning his substance use disorders to be less than credible" and cited several inconsistencies in support of this conclusion. (R. at 77). Although plaintiff testified that since his February 2008 suicide attempt he consumes one to two beers a week, the ALJ noted that plaintiff was arrested and charged with driving under the influence ("DUI") approximately one month prior to the December 2008 hearing. (R. at 77). Plaintiff did not disclose to the ALJ that he had recently been arrested, but the ALJ noted it was interesting that plaintiff testified he recently sold his car. (*Id.*).

Plaintiff made a number of inconsistent statements to medical sources of record concerning his drug and alcohol use. Although plaintiff testified before the ALJ that he used to drink everyday, he told Dr. Matta that he had been drinking three to four days a week prior to his suicide attempt. (R. at 77). The ALJ noted that when plaintiff saw Dr. Matta again in July 2008, he denied any drug and alcohol use since February 2008. (*Id.*). Despite plaintiff's contention during the hearing that he abused marijuana in the past, he told Dr. Liedke that he never had a problem with illegal drugs. (*Id.*).

The ALJ addressed why he did not find plaintiff's testimony regarding his apparent confusion and lack of concentration to be credible. (R. at 77). The ALJ noted that despite plaintiff's contention of confusion, he is able to reside alone and rents a duplex. (R. at 78). Plaintiff is also able to clean his home and contact the appropriate repairmen when maintenance is necessary. (R. at 29, 78). The ALJ heard testimony from plaintiff that he enjoyed watching television, had recently read a short story by Mark Twain which he was able to describe for the ALJ and was able to use his bicycle to go to the library on occasion. (R. at 24, 27, 31); *see* 20 C.F.R. §§ 404.1529(c)(3)(I), 416.929(c)(3)(I) (daily activities are relevant in evaluating a claimant's symptoms).

Plaintiff's mother testified her son has a drinking problem, but could not indicate the amount of his consumption and was seemingly unaware of plaintiff's recent DUI arrest. (R. at 77). Although plaintiff's mother testified plaintiff is forgetful, she acknowledged that he improved since beginning his medical health care treatment in 2008. (R. at 41). Plaintiff also contended that his treatment, specifically medications, had been "very much" helpful to him. (R. at 19).

Plaintiff's record indicates that since his discharge in February 2008, his cognitive functioning has significantly improved. (R. at 78). Dr. Matta met with plaintiff at the HSC for several follow-up evaluations following plaintiff's February 2008 hospitalization. While plaintiff in his brief points to Dr. Matta's May 20, 2008, GAF assessment of 45, Dr. Matta's evaluations note plaintiff's condition improved over time. (R. at 564, 582, 585). Dr. Matta believes plaintiff seems willing to work "if the opportunity to work should present itself." (R. at 78).

The ALJ referred to a psychological examination by Dr. Lunnen which revealed that

despite plaintiff's allegation of poor concentration, plaintiff had average concentration. (R. at 405-06). There were no reported memory problems. (R. at 405). Indeed, Dr. Lunnen noted that plaintiff's thought processes were logical, linear, and goal directed. (R. at 406). The ALJ specifically noted that Dr. Lunnen concluded that plaintiff "presented with fairly intact cognitive functioning." (R. at 78, 406). Dr. Lunnen noted that plaintiff was, at most, moderately limited in his ability to follow detailed instructions. (R. at 408). While plaintiff still had depression and anxiety, there were no specific limitations noted by Dr. Lunnen which were not included in plaintiff's RFC.

The ALJ relied on Dr. Liedke's consultative psychological examination. (R. at 78). Dr. Liedke saw plaintiff just three weeks following his suicide attempt and noted that plaintiff was being medicated for depression and sleep difficulties. (R. at 410). Dr. Liedke noted that plaintiff's personality type appeared to be quiet and reserved, but he did not appear to be anxious or panicky. He commented that plaintiff was "very direct and surprisingly articulate." (R. at 413). Dr. Liedke believed that plaintiff is a "very bright man. . . ." (R. at 78).

The ALJ addressed Dr. Uran's January 2009 neuropsychological evaluation. During Dr. Uran's evaluation, "when the tester left the room, the client read through the test booklet and was asking questions about why he was not being administered certain tests." (R. at 590). The ALJ noted this and concluded that "the claimant appears capable of functioning at a higher cognitive level than he would have me believe." (R. at 78). Dr. Uran opined that plaintiff "would have difficulty performing tasks involving speed of execution as well as difficulties in sustaining attention and concentration and carrying out instructions." (*Id.*). Those limitations were included in the hypothetical.

The ALJ noted that although the record was left open to receive medical opinions about plaintiff's impairments and the role of drug and alcohol use in the level of impairments, the supplemental reports of Drs. Matta and Uran did not "address the limitations attributable to [[plaintff] if his drug and alcohol use disorder stopped." (R. at 76). The ALJ commented that "[e]ven though counsel was asked to address the issue of the materiality of his client's substance use disorders, neither of the post-hearing medical narratives received from Drs. Matta or Uran squarely deal with this specific issue." (R. at 78). Dr. Matta's diagnoses involve substance use disorders, which Dr. Matta opined were highly likely to be causing plaintiff's "current psychological issues." (*Id.*). At the conclusion of his decision, the ALJ noted that "the burden remains on the claimant to show that he would be disabled in the absence of substance abuse." (R. at 79-80). Several courts of appeals have held that the claimant bears the burden of proving disability in the absence of drug or alcohol abuse when medical evidence has established an impairment of alcoholism. *See Parra v. Astrue*, 481 F.3d 742 (9th Cir. 2007); *Doughty v. Apfel*, 245 F.3d 1274, 1276 (11th Cir. 2001); *Mittelsted v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000); *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 2000). The court concludes that the Court of Appeals for the Third Circuit would follow the rationales of those decisions. *Cf. Kracht v. Comm'r of Soc. Sec.*, Civ. Action No. 2:09-cv-06010, 2010 WL 4980901, at *5 (D.N.J. Dec. 2, 2010).

The ALJ accounted for plaintiff's cognitive limitations in the RFC determination. (R. at 76). Plaintiff argues that Dr. Uran's opinions demonstrate that his "mental and physical impairments continue to be severe and would preclude him from performing any type of substantial work." (ECF No. 7, 9). The ALJ, however, accounted for plaintiff's cognitive limitations noted by Dr. Uran and considered her opinion in his RFC finding. (ECF No. 7, 9)(R.

at 78). Despite believing the plaintiff was capable of higher cognitive levels than he was attempting to portray, the ALJ "decided to restrict him to simple routine, repetitive work and limited interactions with others." (R. at 78). Therefore, the ALJ addressed Dr. Uran's determination of plaintiff's cognitive limitation of "difficultly performing tasks involving speed of execution," as well as plaintiff's apparent difficulties in sustaining attention, carrying out instructions and interacting with others. (*Id.*) The ALJ included these limitations in the RFC determination. The ALJ as the finder of fact retains the duty to evaluate medial opinions and assess whether they are consistent with and supported by the rest of the record. 20 C.F.R. § § 404.1527(d), 416.927(d). The ALJ sufficiently addressed Dr. Uran's opinion regarding plaintiff's cognitive limitations to permit the court to ascertain the basis for his decision.

No medical opinion evidence of record indicates plaintiff would still be disabled if he stopped his substance abuse. The medical opinion evidence consistently reflected that alcohol abuse was the main source for plaintiff's disability. Dr. Matta noted that plaintiff has an "extensive drug and alcohol history and therefore there is a high likelihood that there is a connection between his substance abuse and these current psychological issues." (R. at 585). The ALJ commented that Dr. Matta had "not expressed an opinion as to what mental diagnoses the claimant would suffer from if the claimant stopped using drugs and alcohol." (R. at 78). Drs. Lunnen, Liedke, and Uran did not rule out a substance abuse disorder as the main cause of plaintiff's mental health impairments. (R. at 406, 414, 591,592). The ALJ noted that there was no documentation of any medical treatment from plaintiff's alleged onset date, June 15, 2002, through April 2004. (R. at 78). The ALJ noted that the medical treatment notes begin in May 2004 when Dr. Sung diagnosed plaintiff with alcohol abuse. (R. at 78). Plaintiff refused drug

and alcohol intervention during his September 2007 hospitalization and attempted suicide "after having consumed a significant amount of whiskey." (*Id.*). The ALJ's concluded that "there is a definitive correlation between the claimant's increased substance use and his loss of work." (*Id.*) The ALJ's decision is supported by substantial evidence; he sufficiently addressed the record evidence and his reasons for rejecting or accepting the evidence.

The ALJ's analysis of plaintiff's mental impairments sufficiently addressed the record. The ALJ applied the correct legal framework to conclude that without a substance use disorder, there would be a significant number of jobs in the national economy plaintiff could perform. This conclusion was supported by substantial evidence. *See Kracht v. Comm'r of Soc. Sec.*, Civ. Action No. 2:09-cv-06010, 2010 WL 4980901 (D.N.J. Dec. 2, 2010); *Coy v. Astrue*, Civ. Action No. 08-1372, 2009 U.S. Dist. LEXIS 57830 (W.D. Pa. July 8, 2009).

With respect to physical limitations, plaintiff's RFC included limitations caused by rhabdomyolysis. Plaintiff was limited to light work with occasional postural maneuvers and no exposure to dangerous machinery or unprotected heights. (R. at 76). Dr. Lunnen concluded that there was nothing physically barring plaintiff from being employed. (R. at 414). Dr. Liedke concluded that plaintiff could lift and carry occasionally up to fifty pounds and frequently up to twenty-five pounds. (R. at 415-16). The ALJ sufficiently accounted for all plaintiff's limitations supported by the record.

## *Conclusion*

After consideration of the cross-motions for summary judgment, the submissions of the parties, and the record as a whole, the court finds that substantial evidence supports the ALJ's

finding that plaintiff was not statutorily disabled during the relevant time period.

Commissioner's motion for summary judgment will be GRANTED.  Plaintiff's motion for

summary will be DENIED.  The decision of the Commissioner will be affirmed.  An appropriate

order will be entered.

By the court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: December 23, 2010